

FILED

2015 Jul-28  PM 04:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| MICHAEL NORMAN TRAWEEK, | ) ) ) | |
| Plaintiff; | ) ) | |
| vs. | ) ) | 2:14-cv-00308-LSC |
| GLOBAL SOLUTIONS & LOGISTICS LLC, et al., | ) ) ) | |
| Defendants. | ) ) | |

**Memorandum of Opinion**

Plaintiff Michael Norman Traweek filed this action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, alleging that Defendants Global Solutions & Logistics, LLC and Dave Alexander violated the Act's minimum wage requirements. Plaintiff also brings a claim for retaliatory discharge under the FLSA, as well as various state law claims. Before the Court is Defendants' motion for summary judgment. (Doc. 19.) Also pending are Defendants' motion to strike (Doc. 22) and motion for a hearing (Doc. 25). For the reasons stated below, Defendants' motion for summary judgment motion is due to be granted in part and denied in part, while Defendants' motion to strike and motion for a hearing are due

to be denied.

## I.   BACKGROUND

Plaintiff Michael Traweek ("Traweek") works in the environmental and industrial cleaning business. In early March 2013, Traweek signed a contract to work with Action Environmental, LLC ("Action"). Under the terms of the written employment contract, Traweek was paid a signing bonus of $150,000.00. This signing bonus was referred to as a "loan," under which Traweek was to be forgiven $30,000.00 of the debt per each year that his sales exceeded $1,000,000.00. Thus, assuming that Traweek met the sales goals put forward in the agreement, the signing bonus-related debt would be repaid after five years. If Traweek left employment with Action at any point before the signing bonus debt was fully forgiven, he was required to repay the remaining balance.

In July 2013, Defendant Dave Alexander ("Alexander") contacted Traweek about coming to work for Alexander's company, Co-Defendant Global Solutions & Logistics, LLC ("Global"). Specifically, Alexander sought to hire Traweek to establish an industrial railcar cleaning division at Global.[1] On July 24, 2013, Traweek sent Alexander an email in which he stated his expected terms of employment,

---

[1] Alexander asserts that Traweek actually contacted him first about coming to work at Global, as Traweek was unhappy at Action.

including a $175,000.00 signing bonus and a salary of $135,000.00 per year. Traweek also informed Alexander in his email that, as a consequence of leaving Action early, he was obligated to repay his signing bonus to Action. Alexander did not respond to this email.

On August 22, 2013, Alexander emailed Traweek a blank form contract for employment at Global, stating in the email that "you [i.e., Traweek] need to put your numbers down and we can finalize it." Traweek responded with an email stating his various expected terms: $150,000.00 per year salary, use of a company vehicle, an unspecified commission plan, and a $175,000.00 signing bonus. Traweek stated that the bonus should be structured "as an unsecured loan" and worded so that it was "paid back with years of service," similar to how Traweek's agreement with Action was structured. Traweek also gave Alexander discretion to determine an appropriate commission structure, acknowledging that he was now asking for a larger salary than initially requested on July 24th. Finally, Traweek asserted that, if Alexander agreed to the terms set forth in the email, Traweek would submit his one-week notice at Action and begin employment at Global on September 9, 2013. Alexander never responded to Traweek's August 22nd email and no written employment contract was ever completed between the parties. However, Traweek did leave his job at Action,

and began work at Global on September 9, 2013, at the company's newly established office in Tuscumbia, Alabama.

Global paid Traweek based upon the $150,000.00 salary requested in the August 22nd email, issuing him checks on a bi-weekly basis in the amount of $5,769.24. However, after a month of working for Global, Traweek had yet to receive any portion of the expected $175,000.00 signing bonus. According to Traweek, Alexander assured him several times in September and October 2013 that the signing bonus would soon be deposited in his bank account. On October 10, 2013, Traweek sent Alexander an email stressing that he needed the $175,000.00 to repay the remaining balance to Action. Traweek attached a copy of the Action signing bonus agreement to his email. Once again, Alexander did not respond to the email. On November 15, 2013, Traweek sent Alexander a text message stating that Action had again contacted him, and asking Alexander "what day did [you] mail the check?" Alexander responded, "Friday/Saturday when your pay went out." However, no bonus check arrived in the mail.

Traweek's relationship with Alexander and Global continued to deteriorate in the coming months. Alexander became increasingly displeased with Traweek's progress in managing an existing tank-cleaning job, while Traweek was frustrated with

the continued delay of his bonus. Furthermore, while Alexander told Traweek during their initial negotiations that Global had access to a "rail spur"—a facility for cleaning railcars that is connected directly to the larger railway system—Traweek learned upon starting work at Global that the company was in fact still looking to purchase such a facility. In early December, Traweek again raised the signing bonus subject, and Alexander commented that Global needed to start generating revenue with the railcar cleaning operation before the bonus could be paid. Traweek reminded Alexander that he brought clients with him from Action, but that Global lacked the facilities necessary to clean railcars.

On Friday, January 17, 2014, Traweek did not receive his usual paycheck. Shortly thereafter, Traweek, Alexander, and Alexander's wife[2] met at a restaurant and Traweek was given a hand-written paycheck. The parties' accounts differ as to what was discussed during this meeting. Alexander asserts that he used the meeting to inform Traweek that he was, in effect, being terminated. According to Alexander, it was made clear to Traweek during the meeting that any future compensation from Global was contingent on Traweek quickly establishing a viable railcar cleaning business for the company. Traweek, on the other hand, claims that the parties never

---

[2] Alexander's wife, Amy Alexander, was co-founder and President of Global. Ms. Alexander is not a defendant in this action.

discussed discontinuing his salary, and that he was merely instructed to continue attempting to establish a railcar cleaning division at Global. In support of his pending motion for summary judgment, Alexander submitted a "personnel action form" stating that Traweek was terminated on January 17, 2014 due to poor performance. However, there is no indication that Traweek had any knowledge of this form.

Despite his alleged termination, Traweek continued to have some involvement with Global following the January 17th meeting. On January 23, 2014, Alexander sent Traweek a text message asking him to participate in a business-related conference call on January 24th. Traweek agreed, but ultimately was unable to make the call due to inclement winter weather. Traweek was also involved in discussions concerning the potential acquisition of a rail spur facility in Phenix City, Alabama (referred to by the parties as the "State Dock Property").[3] On January 31, 2014, Traweek sent Alexander an email asserting that he had once again not been issued a paycheck, and that he considered Global to be in violation of the FLSA. Alexander called Traweek sometime after this email was sent. While on the phone, Alexander stated that he "had done

---

[3] The parties dispute the significance of any talks involving the State Dock Property. Traweek claims that he was involved in negotiations concerning the State Dock Property on Global's behalf. Alexander, on the other hand, asserts that Global had no interest in buying the State Dock Property following Traweek's "termination," but still aided Traweek in his pursuit of the property should Traweek wish to acquire it to develop his own business, with the possibility that, should the endeavor prove profitable, Global and Traweek could once again work together in some capacity.

enough" on Traweek's behalf, and was upset at both the FLSA allegation and Traweek's failure to make the January 24th conference call.

After not receiving a second consecutive paycheck on February 14th, Traweek emailed Alexander, stating that he was leaving Global due to the company's continued failure to pay his salary. The parties thereafter arranged for Traweek to return his company vehicle. Traweek resumed work for his old employer, Action, on February 17, 2014. Having already repaid Action $100,000.00 of the signing bonus-related debt, Action and Traweek ultimately reached an agreement by which his remaining debt will be forgiven through continued employment. Traweek filed this action on February 20, 2014. Traweek's complaint alleges claims for (1) violation of the FLSA's minimum wage requirements; (2) violation of the FLSA's prohibition on retaliatory discharge; (3) breach of contract; (4) breach of an implied-in-fact contract; and (5) promissory fraud.

## II.  Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248, 106 S. Ct. 2505, 2510 (1986); *see also Avenue CLO Fund, Ltd. v. Bank of Am., NA*, 723 F.3d 1287, 1294 (11th Cir. 2013). There is a "genuine dispute" as to a material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510. The trial judge should not weigh the evidence but must simply determine whether there are any genuine issues that should be resolved at trial. *Id.* at 249, 106 S. Ct. at 2511.

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "considering all of the evidence and the inferences it may yield in the light most favorable to the nonmoving party." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013) (citing *Ellis v. England*, 432 F.3d 1321, 1325 (11th Cir. 2005)). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *Id.* Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the

Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S. Ct. 2548, 2555 (1986).

## III.  DISCUSSION

### A.    FLSA Claims

The FLSA requires that employers pay all covered employees a statutorily prescribed minimum wage for each hour worked. *See* 29 U.S.C. § 206(a)(1); 29 U.S.C. § 207(a). For each hour over forty hours worked in a given week, an employer must pay employees 1.5 times their usual rate of pay. *See* 29 U.S.C. § 207(a).Traweek's FLSA claim for unpaid wages concerns the period between January 17, 2014, and February 14, 2014.[4] Traweek asserts that, during that time frame, he worked for Global without receiving any compensation at all. Global and Alexander acknowledge that Traweek's last paycheck was issued on January 17, 2014. However, they argue that no further compensation was required under the FLSA due to the fact that Traweek was no longer employed by Global following the January 17th meeting, during which Alexander informed Traweek that he was being terminated and that any further work Traweek attempted on the railcar cleaning operation would be without

---

[4] While Traweek also asserts that he never received compensation for his first two weeks of work at Global, the record indicates that Traweek did in fact receive his regular salary for that period, which far exceeds the FLSA's minimum wage requirements. *See* Doc. 19-4, at 1.

any guaranteed compensation.

Taking the evidence in the light most favorable to Traweek, a genuine issue of material fact exists concerning whether Traweek was still an employee at Global following the January 17th meeting. First, Traweek disputes Defendants' characterization of the January 17th conversation, claiming that Alexander merely emphasized to him the importance of quickly establishing a viable railcar cleaning operation for Global. According to Traweek, at no point during the meeting was he informed that he was being fired. Furthermore, Traweek has offered some evidence suggesting that he was still an employee at Global following the January 17th meeting. For example, Traweek continued to have access to his company vehicle following the meeting, and was asked to participate in a conference call concerning Global's business affairs the following week. Accordingly, a genuine issue of material fact exists as to whether Traweek remained a current, protected employee under the FLSA following the January 17th meeting.

Defendants further argue that, even if Traweek remained an employee following the January 17th meeting, Traweek's position at Global was exempt from the FLSA's minimum wage requirements. Under § 213(a)(1) of the FLSA, some employees are exempt from the Act's minimum wage requirements. Alexander and

Global argue that Traweek's position qualifies for the "executive employee" exemption set forth in § 213(a)(1). In fact, Defendants assert that, because Traweek's salary exceeded $100,000.00 per year on a pro-rata basis, he qualified for the "highly compensated employee" exemption, which streamlines analysis concerning whether an employee is an "executive" under the FLSA. *See* 29 C.F.R. § 541.601 (significantly simplifying analysis of an employee's duties for purposes of finding an executive exemption when that employee receives $100,000 per year in compensation). Exemptions under the FLSA are affirmative defenses, and the defendant-employer bears the burden of proving that an exemption is applicable in a given case. *See Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1269 (11th Cir. 2009). This Court "narrowly construes" exemptions to the FLSA's overtime requirements. *See id.* (stating also that an exemption "is to be applied only to those [employees] clearly and unmistakably within the terms and spirit of the exemption").

The Court need not spend much time at this stage addressing the various requirements of the executive/highly compensated employee exemptions, as Defendants concede that they did not pay Traweek *any* compensation for the disputed final month of Traweek's employment. The most recent FLSA regulations make clear that, to qualify for either of the exemptions at issue, an employee must receive his or

her salary payments on a *regular*, predetermined basis. *See* 29 C.F.R. § 541.602(a) (stating that an employee will be considered to be paid on "a salary basis" only if "the employee *regularly receives each pay period* . . . a predetermined amount constituting all or part of the employee's compensation" (emphasis added)); *see also id.* (stating that, "subject to the exemptions provided in paragraph (b) of this section, an exempt employee *must receive the full salary for any week in which the employee performs any work* without regard to the number of days or hours worked" (emphasis added)). While ceasing to pay an employee's salary on a regular basis does not necessarily mean that employee loses his or her exemption, a Defendant is required to point to a specific exception under 29 C.F.R. § 541.602(b) that excuses the failure to regularly pay a predetermined amount of compensation, or in the alternative, provide evidence that the reduction in pay was not occasioned by a change in the quality or quantity of work the plaintiff-employee performed. *See Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 847–48 (6th Cir. 2012).[5] In other words, it is insufficient for an employer-

_____

[5] The Court further notes that, at least for the purposes of summary judgment, Defendants apparently concede the Court should use the compensation that Traweek *actually* received—rather than the compensation that he was scheduled to receive pursuant to the disputed employment agreement—when calculating his salary for the purposes of determining whether an FLSA exemption applies. *See* Defendants' Brief in Support of Summary Judgment, Doc. 20, at 25 (using the pay Traweek actually received when calculating whether his salary exceeded $100,000.00 per year on a pro rata basis). Such an approach is consistent with the newest version of the FLSA's accompanying regulations. *See Orton*, 668 F.3d at 848 (stating that, under the newest regulations, "[t]he question is . . . not what [a plaintiff] was owed under his employment agreement; rather, the

defendant to merely assert that, had the plaintiff-employee been receiving the compensation he or she was entitled to pursuant to an employment agreement, that employee would qualify for an exemption.

Simply put, Defendants do not dispute that Traweek received no pay whatsoever from January 17, 2014 to February 14, 2014, as they argue only that Traweek was no longer an employee during that time frame. Assuming that Traweek was employed during the interval in question, Defendants have failed to identify a specific basis, such as the exceptions put forth 29 C.F.R. § 541.602(b), excusing their failure to regularly pay Traweek his "predetermined amount" of salary. Thus, a material issue of genuine fact exists concerning whether Traweek lost his exemption from the FLSA's minimum wage requirements during the disputed final month of his employment at Global.

Finally, Defendants argue in passing that Traweek also met the "outside salesman" exemption under 29 C.F.R. § 541.500 during the period following January 17, 2014. However, whether this exemption applies is entirely dependent on whether a fact finder determines that Alexander informed Traweek that his salary was being discontinued following the January 17th

_____

question is what compensation [a plaintiff] actually received").

meeting, and that any further compensation would be contingent on Alexander producing revenue for Global through client development.

Traweek also brings a retaliation claim under the FLSA, asserting that he was constructively terminated after complaining about not receiving any compensation following January 17, 2014. Section 215(a) of the FLSA "protects persons against retaliation for asserting their rights under the statute." *Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1343 (11th Cir. 2000). A plaintiff establishes a *prima facie* case of retaliation by showing that "'(1) she engaged in activity protected under [the FLSA]; (2) she subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action.'" *Id*. at 1342–43 (quoting *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 208–09 (10th Cir. 1997)). An employer may offer a "legitimate reason for the adverse action," which the plaintiff must then show was mere pretext for the firing. *See id*. at 1343. When establishing causation, a plaintiff must show that the assertion of FLSA rights was the "but for" cause of the plaintiff's termination. *See Reich v. Davis*, 50 F.3d 962, 965–66 (11th Cir. 1995).

Summary judgment is due to be denied on Traweek's retaliation claim. First, Traweek has offered evidence that he engaged in a "protected activity" under the

FLSA. Traweek sent an email to Alexander on January 31, 2014, asserting that, in Traweek's opinion, failure to pay him for the previous two weeks of work constituted an FLSA violation. While not of the same character as a lawsuit or other formalized grievance, such a complaint is "activity protected" under the FLSA. *See E.E.O.C. v. White and Son Enters.*, 881 F.2d 1006, 1011 (11th Cir. 1989) (finding that employees' informal complaint to their supervisor about unequal wages constituted "an assertion of rights protected" under the FLSA). Alexander and Global argue that, because Traweek was terminated prior to his email complaining about a potential FLSA violation, he could not have "reasonably believed" that he was engaging in protected activity under the FLSA. *See Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1388 (11th Cir. 1998) (requiring that a plaintiff bringing a retaliation claim have a "reasonable belief" that he or she was asserting valid rights under the FLSA, and incorporating both a subjective and objective component into the test). In the alternative, they argue that Traweek could not have "reasonably believed" that he was engaging in protected activity because, under existing law, Traweek's position was clearly exempt from the FLSA's minimum wage requirements. Having already found that reasonable jurors could differ concerning whether Traweek was in fact terminated on January 17, 2014, and that, at least at this stage, Defendants have failed to show that

one of the FLSA's exemptions applies, Defendants' arguments on this issue are rejected.

Furthermore, Traweek has offered some evidence suggesting that an "adverse employment action" occurred. Traweek claims that Global's continued failure to provide any compensation following his informal FLSA complaint eventually forced him to quit employment at Global, amounting to a constructive discharge. To establish that a constructive discharge occurred, a plaintiff must show that "the work environment and conditions of employment were so unbearable that a reasonable person in that person's position would be compelled to resign." *Virgo v. Va. Beach Assoc., Ltd.*, 30 F.3d 1350, 1363 (11th Cir. 1994). Viewing the evidence in the light most favorable to Traweek, a reasonable jury could find that Traweek was still working for Global following January 17th, and that Traweek's resignation on February 14, 2014 was the forced result of Defendants' failure to pay him any compensation for the previous month's work. Furthermore, assuming that Traweek was still employed following the January 17th meeting, Global's failure to pay his wages can, in itself, be considered an "adverse employment action." *See, e.g., Penn. State Police v. Suders*, 542 U.S. 129, 134 (2004) (stating that "an extreme cut in pay" can, under some circumstances, provide a basis for alleging constructive discharge); *Bass v. Bd. of Cnty.*

*Comm'rs*, 256 F.3d 1095, 1118 (11th Cir. 2001) (stating in a Title VII case that an adverse employment action can be "conduct that alters the employee's compensation"), *overruled in part on other grounds by Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008).

Finally, Traweek has offered some evidence that his decision to complain about his lack of pay caused both his continued lack of pay and his eventual "constructive termination." Traweek stated in his deposition that Alexander called Traweek and admonished him for sending the January 31st email accusing Defendants of violating the FLSA. Traweek further stated that, after that initial phone call, Alexander refused to communicate further. These actions, which occurred close in time to Traweek's FLSA complaint and show anger on behalf of Alexander, are sufficient to establish causation at the summary judgment stage. *See, e.g.*, *Abernathy v. Science Applications Int'l Corp.*, No. 1:11-cv-3805-AKK, 2013 WL 6904089, at *1 (N.D. Ala. Dec. 31, 2013) (stating in a Title VII case that increased hostility following the filing of a complaint, coupled with close temporal proximity between the complaint and the adverse employment action, is sufficient to establish causation for a retaliation claim at the summary judgment stage).

**B.     Breach of Contract Claims**

Traweek also brings a claim for breach of contract, or in the alternative, breach of an implied-in-fact contract. Under Alabama law, the elements of a contract are (1) an offer and an acceptance; (2) consideration; and (3) mutual assent "to terms essential to the formation of the contract." *See Strength v. Ala. Dep't of Fin., Div. of Risk Mgmt.*, 622 So. 2d 1283, 1289 (Ala. 1993). Global and Alexander do not dispute whether Traweek has presented evidence that is sufficient to survive summary judgment concerning any breach of contract claim for unpaid salary during the January 17 to February 14, 2014 time frame. Rather, at issue is whether the parties ever formed a contract concerning the $175,000.00 signing bonus. Traweek contends that Alexander agreed to pay him the signing bonus as part of their email negotiations that occurred prior to Traweek starting work at Global. Traweek points to the August 22, 2013 email as constituting an agreement to pay Traweek a $175,000.00 signing bonus in exchange for his employment at Global. Traweek further argues that, even if Alexander did not expressly agree to the terms contained in this email, his acceptance became effective upon allowing Traweek to start work at Global.

Defendants argue that they never agreed to any signing bonus as a condition of Traweek's hiring. They assert that the August 22nd email lacks the necessary material

terms to constitute an effective contract, and further contend that any agreement for payment of the $175,000.00 signing bonus would, according to Traweek's own description of the disputed agreement's terms, be required to comply with Alabama's statute of frauds. In making this final argument, Defendants point to the fact that Traweek characterized the $175,000.00 signing bonus as an "unsecured loan," and stated that it would be paid back by multiple years of service at Global. *See* Ala. Code § 8-9-2(1) (voiding any agreement that "by its own terms, is not to be performed within one year of the [agreement's] making" unless such an agreement is in writing and signed by the party charged with performance); Ala. Code § 8-9-2(7) (requiring the same with respect to agreements "to lend money . . . except for consumer loans with a principal amount financed less than $25,000").

This Court need not address Defendants' statute of frauds argument, since Traweek has failed to establish a necessary element for any contract-based claim: mutual assent to the "terms essential" to the formation of the contract. *See Strength*, 622 So. 2d at 1289; *see also White Sands Grp., LLC v. PRS II, LLC*, 998 So. 2d 1042, 1051 (Ala. 2008) ("To be enforceable, the [essential] terms of a contract must be sufficiently definite and clear" (internal quotations omitted)). Traweek asserts that the August 22nd email forms the basis of the signing bonus agreement, yet the email

leaves out several terms that may fairly be considered "essential" to performance of the contract in dispute. Most notably, the email fails to specify the length of time that Traweek would be required to work for Global before he could leave the company without being obligated to repay some portion of his signing bonus, and Traweek conceded in his deposition that no specific time frame was ever discussed. It is well-established under Alabama law that the rate at which a loan is repaid is a term "essential" to any such agreement. *See, e.g.*, *Capmark Bank v. RGR, LLC*, 81 So. 3d 1258, 1268 (Ala. 2011).

While Traweek may have intended the August 22nd email to act as a definite offer for his employment in exchange for the signing bonus, a party's intentions are insufficient to create a binding agreement where the offer in question is missing important terms. *See Macon Cnty. Greyhound Park, Inc. v. Knowles*, 39 So. 3d 100, 108 (Ala. 2009) ("'Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.'" (quoting 17A Am. Jur. 2d *Contracts* § 183 (2004))). Indeed, the wording of the August 22nd email makes clear that it constituted informal, preliminary discussions as to the terms of the signing bonus and other employment specifics, rather than a firm and definite offer that contained all the terms necessary

to form a binding agreement. The email asks Alexander to, at a later time, draw up paperwork specifying the "years of service" required to pay off the signing bonus-related debt, and gives Alexander complete discretion as to how to structure Traweek's commission payments. A contract containing all the material terms necessary for enforcement of the signing bonus may have resulted if, in accordance with Traweek's expectations, Alexander had followed up with more specific terms. However, Alexander had no obligation to do so, and the August 22nd email is, standing alone, too uncertain to create a binding agreement. *See White Sands*, 998 So. 2d at 1051 (stating that "a contract that leav[es] material portions open for future agreement is nugatory and void for indefiniteness"); *see also Howard v. Ryder Truck Rental One-Way, Inc.*, 624 So. 2d 169, 170 (Ala. 1993) (stating that, despite the parties' intentions in the moment, an "agreement to agree" upon unsettled terms is generally non-enforceable).

In addition, were the Court to find that the August 22nd email constituted the terms of a binding agreement, Alexander and Global would be left without a means to enforce their own rights under the alleged contract. This is because, while the email includes a signing bonus amount and states a preference for "repayment" of the signing bonus via "years of service," the email fails to provide any basis for

determining just how much of the $175,000.00 signing bonus Traweek would be entitled to keep after only six months of employment at Global. A contract does not exist where, due to the alleged agreement's incomplete terms, only one party's remedies may be determined in the event of breach. *See White Sands*, 998 So. 2d at 1051 (asserting that the terms of a contract must provide a basis for "determining the existence of breach and giving an appropriate remedy").

Though it is not entirely clear, Traweek also seems to argue that, to the extent that the August 22nd email was too indefinite concerning the signing bonus's essential terms, those terms were to be borrowed from Traweek's written agreement with his previous employer, Action. However, Traweek did not supply Alexander with the Action agreement until October 11, 2013, which was almost two months after the parties' August 22nd email discussing the signing bonus. Furthermore, Traweek stated to Alexander that he was forwarding Alexander a copy of the Action agreement merely to provide "proof of the situation I'm in" (i.e., to show that he was currently obligated to repay the balance of Action signing bonus). Also, material terms differ: the Action agreement concerns a signing bonus of a different amount than that discussed between Alexander and Traweek, and contains a detailed, revenue-based "debt forgiveness" scheme that was never mentioned in negotiations between the

parties here. While a court may occasionally "read-in" missing terms to an agreement where those terms are consistent with the parties' manifested intentions, adopting the old Action agreement's terms would far exceed the Court's appropriate role in providing missing terms or clarifying ambiguous terms. *See Muscle Shoals Aviation, Inc. v. Muscle Shoals Airport Auth.*, 508 So. 2d 225, 228 (Ala. 1987) (stating that "[i]t is not the province of the court to make or remake a contract for the parties").

Traweek's claim based on the existence of an implied-in-fact contract fails for many of the same reasons. An implied-in-fact contract "requires the same elements as an express contract, and differs only in the 'method of expressing mutual assent.'" *Ellis v. City of Birmingham*, 576 So. 2d 156, 157 (Ala. 1991) (quoting *Berry v. Druid City Hosp. Bd.*, 333 So. 2d 796, 799 (Ala. 1976)). Under Alabama law, implied-in-fact contracts are usually found to exist only where "some commercial transaction pursuant to a contractual relationship was evidently the intent of the parties," as demonstrated by their relationship and actions. *Wellborn v. Snider*, 431 So. 2d 1198, 1200 (Ala. 1983); *see also, e.g.*, *Berry*, 333 So. 2d at 799 (finding at the motion to dismiss stage that a plaintiff sufficiently alleged the existence of an implied-in-fact contract based on a hospital's implied agreement to "treat, observe, and care for" the plaintiff). In this case, Traweek and Alexander engaged in written negotiations but

failed to reach an agreement setting forth all the terms necessary for enforcement of the signing bonus. While an implied-in-fact contract claim allows for a contract to be enforced where there is "a bargained-for exchange contemplated by the parties, but no overt expression of agreement," *see Ellis*, 576 So. 2d at 157, a implied-in-fact contract does not exist where the contours of the implied "agreement" are too vague and uncertain to be defined. In other words, while the parties' later actions here may allow the Court to infer mutual assent with respect to an at-will employment contract at a $150,000.00 per year salary, they do not allow for enforcement of a signing bonus agreement that, for the reasons stated above, is clearly lacking several terms essential to performance.

## C.    Promissory Fraud

Finally, Traweek asserts a claim for promissory fraud. "A claim of promissory fraud is 'one based upon a promise to act or not to act in the future.'" *Ex parte Michelin N. Am., Inc.*, 795 So. 2d 674, 678 (Ala. 2001) (quoting *Padgett v. Hughes*, 545 So. 2d 140, 142 (Ala. 1988)). Under Alabama law, the elements of a fraud are "(1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation." *Southland Bank v. A&A Drywall Supply Co., Inc.*, 21 So. 3d 1196,

1210 (Ala. 2008) (internal quotations omitted). To prevail on a promissory fraud claim, a plaintiff must show two additional elements: "(5) proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised, and (6) proof that the defendant had the intent to deceive." *Id.* (internal quotations omitted).

Traweek's promissory fraud claim is based primarily on Alexander's supposed promise to pay Traweek the $175,000.00 signing bonus mentioned in Traweek's August 22nd email. Traweek asserts that he suffered significant detriment when, relying upon Alexander's apparent acceptance of the terms put forth in the August 22nd email, Traweek left employment with Action, thereby obligating himself to repay the balance of the $150,000.00 Action signing bonus. Defendants argue that Traweek's reliance on Alexander's silence concerning the proposed signing bonus was unreasonable, and further assert that, under Alabama law, a plaintiff is barred from bringing a fraud claim based on a promise that is subject to the requirements of the statute of frauds. *See Bruce v. Cole*, 854 So. 2d 47, 57–59 (Ala. 2003).

Traweek's claim for promissory fraud is due to fail because, even viewing the evidence in the light most favorable to Traweek, he cannot be said to have *reasonably* relied on Alexander's supposed promise. In his deposition, Traweek stated that he

considered the August 22nd email—which, again, Traweek himself prepared and to which Alexander never responded—to be the basis for Alexander's promise to pay a signing bonus to Traweek upon his starting work at Global.[6] *See* Doc. 19-5, at 90. As discussed *supra*, Part III.B, the email in question reads as an informal, preliminary discussion concerning the terms of employment, especially with respect to the signing bonus and compensation structure. As such, it was unreasonable for Traweek to assume that Alexander had, either by his silence or by allowing Traweek to start work without further discussion, agreed to pay Traweek the $175,000.00 signing bonus. *See Allstate Ins. Co. v. Eskridge*, 823 So. 2d 1254, 1265 (Ala. 2001) (finding that a plaintiff unreasonably relied upon the defendant insurance company's vague, indefinite assurances concerning sick leave, and stating that "'if the [plaintiff] blindly trusts, where he should not, and closes his eyes where ordinary diligence requires him to see, he is willingly deceived'" (quoting *Torres v. State Farm Fire & Cas. Co.*, 438 So. 2d 757, 759 (Ala. 1983))).

Simply put, it was unreasonable for Traweek to assume that an informal, un-acknowledged email constituted a promise to pay a $175,000.00 signing bonus. The form contract attached to Alexander's earlier August 22nd email did not mention a

---

[6] In fact, Traweek erroneously asserted in his deposition that Alexander replied to the August 22nd email, apparently mistaking an email sent earlier that day as a reply email.

signing bonus *at all*, and thus, at the very least, should have prompted further inquiry from Traweek concerning whether a signing bonus was to be part of any employment agreement. *See AmeriUs Life Ins. Co. v. Smith*, 5 So. 3d 1200, 1208 (Ala. 2010) (stating that a plaintiff cannot show reasonable reliance where he fails to investigate circumstances that plainly should invoke further inquiry). However, Traweek failed to take any steps to discover whether Alexander agreed in principle to the bare-bone terms set forth in Traweek's August 22nd response. Having failed to seek clarification concerning the contours of any contract for employment at Global before leaving his previous job at Action, Traweek now seeks to convert into an intentional tort what is really a dispute over the finality and effectiveness of a potential agreement's terms.

Furthermore, to the extent that Traweek intends to use any later representations to establish promissory fraud—most notably the November 13th text message from Alexander indicating that a portion of the signing bonus would soon be deposited into Traweek's account—these alleged misrepresentations were made well after Traweek incurred the detriment in question (i.e., leaving employment at Action, and thus taking on an obligation to repay his signing bonus). Accordingly, Traweek has failed to offer evidence showing that any of these later representations caused the injury at issue. *See Southland Bank*, 21 So. 3d at 1210 (asserting that, with any claim

for fraud, a plaintiff must show that the defendant's alleged misrepresentation was a proximate cause of plaintiff's stated harm).[7]

### D.    Other Pending Motions

Alexander and Global have also filed a motion to strike certain evidence (Doc.22), as well as a motion for a hearing concerning Defendants' motion to strike and motion for summary judgment (Doc. 25). Defendants' motion to strike concerns several emails that Traweek sent to himself during the course of his employment with Global. These emails are essentially notes that Traweek took concerning interactions with Alexander, as well as various statements that Alexander allegedly made to Traweek. Defendants argue that these emails are inadmissable hearsay.

Defendants' motion is, in large part, rendered moot as a result of this Memorandum of Opinion. Most of the evidence at issue is relevant only to the state law claims seeking recovery of the signing bonus, and even considering the evidence at issue, Plaintiff has failed to create a genuine issue of material fact with respect to these claims. However, to the extent that the email "notes" are relevant to Traweek's

---

[7] Traweek's complaint hinted at another "material misrepresentation" by alleging that Alexander lied to Traweek about owning a rail spur facility. However, Traweek abandoned any argument based on these allegations by not responding to Defendants' contentions that, even if Alexander did tell Traweek that he had a rail spur facility, that statement was not sufficient to maintain an action for promissory fraud. *See Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1325–26 (11th Cir. 2000) (noting that "failure to brief and argue [an] issue during the proceedings before the district court is grounds for finding the issue abandoned").

FLSA claims and claims for unpaid salary under state contract law, Defendants' motion is due to be denied. While the Court may well determine at trial that the emails themselves are inadmissable hearsay, nothing prevents Traweek from personally testifying as to his interactions with Alexander. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012) (stating that "'a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form'" (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999))). Accordingly, Defendants' motion to strike and motion for a hearing are due to be denied.

## IV.   CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is due to be granted as to Traweek's claims for breach of contract, breach of an implied-in-fact contract, and promissory fraud. Defendants' motion is due to be denied as to all remaining claims. Defendants' motion to strike and motion for a hearing are also due to be denied.

A separate order will be entered.

Done this 28th day of July 2015.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

177822